Graham versus Haughey. Mr. Wilson. Good morning. May it please the court, my name is David Wolfson. I represent Appellant the Graham Company. I'd like to reserve five minutes for rebuttal, please. All right. Thank you. We're here today because the district court erroneously applied an incorrect legal standard in overturning the jury's verdict under the discovery rule within the Copyright Act, a ruling of the jury that was in favor of the Graham Company on the affirmative defense of the statute of limitation. Why weren't there storm warnings? Storm warnings require that there have been a storm. To use the metaphor from the Warren Friedenfeld case, in order for there to be smoke, there has to be a fire that has started in the past. What facts were known by your client? Well, it was undisputed, first of all, that the Graham Company did not know, did not know, that Mr. Haughey had these binders. And in fact, Mr. Haughey threw out the binders, disposed of them, spoliated of them. So it was never clear. He never turned them back. It was never clear what he had. Whatever it was, yes, Your Honor. He was not supposed to retain them. He was supposed to return them. Well, there was conflicting evidence in front of the jury about what he was supposed to do with respect to what he had. And again, we don't know what he had because he disposed of them shortly after getting there. There was a contract that he signed, November 25th, 1991. I think it's PX21. And that contract was a three-way agreement between the Graham Company, Mr. Hoy, and his new employer, Fogg. And in that contract, that contract, November 21st, was two to three months after Mr. Hoy left the employment of the Graham Company. So now, in hindsight, we know he had something, which at the time the Graham Company didn't know. And it's several months later, he's already gone to this new position. The Graham Company is agreeing to that and is selling him some accounts. And in that contract, it says you will return certain materials, but it also says you can keep certain materials. You can keep materials that are related to the accounts that we're selling you. That contract is not in the appendix, am I correct? It is in the appendix, Your Honor. Where is it? I will get you the site and give it to Your Honor on rebuttal if that's okay. Okay. That was, I think it's PX-21, but we'll find the appendix site for you. Now, that contract, interestingly enough, Chief Judge Sirica, that was the only contract that was in evidence. Chief Judge Bartle, in his opinion- Three months after he left? Yes. So he's gone. We now know, in retrospect, that he has some materials. He signs a contract, and the contract says return books and records, general language. Then more specific language, it says you can keep some materials. And then in a third piece of language, and this was not only in front of the jury, but I argued it in my opening to the jury, it says to the extent that I have the works, the books that were at issue in the case, the standard proposal and the standard survey and analysis, I will hold them in trust and confidence for the sole benefit of the Graham Company. So there's a belt and suspenders language in the contract before the jury, emphasized by me in my opening, that even if he did have the books, he's not allowed to use them for the benefit of anybody else. So even if you say, okay, he had something, and the Graham Company should have known that he had it, right? Again, no evidence that the Graham Company knew that he had it. But you have a contract that he enters into after he's left saying, I'm not going to misuse these books. So whatever storm warning you say there was beforehand has now dissipated. More importantly, Mr. Graham had agreed, agreed by actually affirming the Graham Company's copyright in its works. He himself put the copyright notice on the Graham Company's works. And the jury saw that. They saw that and he testified about how, yes, he agreed that the Graham Company had a copyright. So the Graham Company in front of the jury, the jury knows that Mr. Hoy affirms its copyrights. After he leaves, he signs an agreement that says, I will not misuse these books if I have them. And then nothing happens for 10 months. Ten months. The district court ruled that some of the contracts were inadmissible. Was that contract in evidence? That contract, November 25th, 1991, was in evidence. The earlier contracts, for some reason, and we pointed out this mistake, the district court in granting the new trial and overturning the verdict on the statute of limitations relied upon, said that the decision of the jury was against the manifest weight of the evidence. In doing so, the district court relied upon earlier agreements that, frankly, I tried to get evidence, but I wasn't able to. So they were not in front of the jury. The only agreement that was in front of the jury was this two months after he leaves employment agreement, November 25th, 1991. Now, to get back to Your Honor's question about storm warnings, they're not storm warnings because there wasn't a storm. At the time that these events took place, putting aside the fact that there was countervailing evidence in front of the jury, and the jury could have decided that Graham Company reasonably shouldn't have known about infringement, the storm begins in July of 1992, if you want to stay with the metaphor of a storm, right? Or a fire, as in Warren Frieden felt. So there is no infringement. And for copyright, there has to be copying. It's not a violation of the Copyright Act to retain some books. It might be a violation of a contract, right? It's not a violation of the Copyright Act to solicit clients. If I filed... How much of the copyrighted standard works was in the material that Hawhey received from Graham as part of the transfer of the six accounts? That was never entirely clear because he destroyed what he had. But he actually said that he continued to use... But your client knew what it gave him. And all I'm trying to find out is... We couldn't find the records for that, Your Honor. So we... We don't know. We couldn't find out exactly what we gave him. He claimed that he had something, but he also said he disposed of it shortly after he got to his new employer. So because of that destruction of evidence, we weren't able to... My yellow light is going on at 2. That's all right. That's just a warning. Okay. You have three minutes to go. Don't worry about it. Okay. I have three minutes total and then five minutes for rebuttal. Okay. Thank you, Your Honor. The Merck case and the Pharmacia case from this court I think are very instructive here because in Merck and Pharmacia the takeaway is that it's not enough to suspect a defendant of wrongful activity. You have to have the elements, the elements of the cause of action in question. Here we're talking about copyright infringement and the key element is copying. So if you think about the Merck case, in the Merck case the plaintiffs knew or should have known that the defendants had engaged in fraud. There was an FDA letter charging them with fraud and misrepresentation. And yet the court held that there may have been inquiry notice or there could have been inquiry notice with respect to consumer fraud, but there was no inquiry notice with respect to securities fraud. So under Merck you have to have information that a jury then finds is reasonably available to you, that you should have known about, that fulfills all the elements of the cause of action. Similarly, in the Pharmacia case, the court said in dicta, you know, there may very well have been enough here for a Section 11 claim under the Securities Act. There was not enough for Section 10. Section 10 requires scienter. Here there was no evidence of copying, no evidence at all. Do you think that the district court in essence found that there was a likelihood of infringement at some point and transposed that into an infringement? Would you like us to look at it that way? That in effect the district court found that there was a likelihood or a strong likelihood of infringement, but that none had actually occurred. Is that how we should look at this case? I think the court erred. I'm not sure, Your Honor. I think the court didn't expressly find that. I think that's what the court was thinking. I think under the Disabled in Action case what the court did, and again this was an erroneous application of law over which this court's review is plenary. I think under the Disabled in Action case it violated that rule that says that the discovery rule doesn't accelerate inquiry notice. Inquiry notice can only begin when the injury happens. So I think, yes, Your Honor, the district court thought it was likely, but there was no evidence that Mr. Hoy had made up his mind. Remember, he goes to this other job. He's there for 10 months. He doesn't infringe. He had to make the affirmative decision. Okay, now I'm going to violate the Federal Copyright Act, notwithstanding all of his promises to the Graham Company and he himself putting the copyright notice on the works. Anything else you want to tell us? I'll save it for the rebuttal. Any other questions? Not yet. Good. Thank you, Mr. Wilson. Thank you, Chief Justice O'Rourke. Good. Mr. Abrams. Good morning. Good morning, Your Honor. I'm Floyd Abrams. I represent Tom Hoy and USI. There were three issues before the court. I'll address the issue that was addressed by Mr. Wilson first, if I have time. There were eight copies in total of the single most important document that the Graham Company had. The document was, Mr. Graham testified, absolutely essential to the success of the company. The document, as Chief Aide testified, was the basis of the company's success. The document, Mr. Wilson said in his opening to the jury, was critical. They kept it very confidential. They stamped it in a way. This is all supported by testimony referred to in our brief. They stamped it in a way that no outsider could get it. They didn't ask for it back, did they? And they did not ask for it back, notwithstanding that there were so few copies that it was closely held and that it was indispensable to the company, and that there were people who supplemented it. Ms. Jones testified. She went around. She would take the eight copies back. But why didn't they seek the return of the binders that they had given to Hawking? I can't answer that question. I think there are only two possible answers. One is the binders weren't really as important as they testified. I think we have to accept that. But that's different from what you just said. Yes. Yes, that's entirely different. So, I mean, I take their testimony now, as Chief Judge Bartles did, as accurate in that respect. The documents, these documents were indispensable to this company. And so you ask me, why didn't they ask about it? They were negligent or they didn't take any effort. I mean, look what they didn't do. All they had to do was place a phone call. All they had to do was to call up Mr. Hoy after he left or to call his employer, who they knew well, and ask, do you have these documents? Are you using these documents? So how do you use it? Taking what you say, how does that affect what we have to look at? You have to look at whether there were, quote, storm warnings. The storm warnings were of such magnitude that under your Matthews case, if the plaintiff does not make an investigation when it should, Matthews teaches us that in that circumstance, the client, the plaintiff, will be held to be on inquiry notice. And when this document, which existed, as Judge Bartle pointed out. I'm sorry. Maybe my colleagues understood that, but I couldn't follow that. I'm sorry. That point that you made. Am I alone in this thing? You'll have to ask it again. Yeah. I mean, you just said something. I'm not, it's a legal principle. Oh, I'm sorry. I'm saying that this court has held that when an investigation is not made, assuming for the moment that the discovery. By the defendant or by the plaintiff? By the prospective plaintiff. When the owner of a copyright is in a situation where there are storm warnings and does not do an investigation or a sufficient investigation, the Matthews case holds that the court will not overlook the failure to do the investigation. The court will not say, well, maybe they wouldn't have found out anything anyway. The court will assume that what they would have found out is the infringement. But something usually prompts the investigation, does it not? Yes. In the storm warning cases, in securities cases, we're dealing with something that's in the public domain that would cause a reasonable person to investigate. As I understand your argument, you're saying that these documents were so important that Graham should have assumed that your client was going to not only retain them, but that your client was going to copy them and use them for his own benefit? All of that was to be assumed because of the significance of the documents? I wouldn't say that the client need assume that. The client should check that. All right. Okay. Well, let's follow that. He should have picked up the phone and called. But there was a contract between Mr. Hoy and Graham that would have prohibited him from making such misuse of these documents, correct? Yes, there was a contract. If they picked up the phone and called him, why would they presume that the man who's violating the written contract would give them an honest answer and say, oh, yes, I do have them and I'm misusing them in violation of my contract? That doesn't sound like a storm warning. That sounds like almost a frolic. Well, if the answer had been false, it would have been fraud then. If the answer had been, no, I don't have them, or no, I'm not copying them, then there wouldn't be a statute of limitations issue at all because then we would have fraudulent concealment. So their claim rises or falls upon whether they pick up the phone and call the violator? If they pick up the phone and call the breaching party, they're not barred by the statute of limitations because either he gives them an honest answer and then they sue. Yes. Or he lies to them and then tolling ensues. But if they don't ask the violator, then they're barred. I'm not sure I understand the principled nature of the cause of action accruing based upon that factual distinction that you're proposing. The cause of action accrues normally in a copyright case when there is copying, right? They are the ones who come to you and say, we know there's a three-year statute of limitations. We want 13 years of damages because in this case we have met, and it's their burden, whatever obligation there is to escape from, to evade the three-year statute. And they say the reason is the discovery rule. As you know, we make an argument that's the wrong rule. Well, Oshever, I think, was that your opinion? In Oshever, we said the discovery rule applies, right? And I know the Supreme Court hasn't specifically so held. You haven't said that the discovery rule applies in copyright, ever. If Congress intended the injury rule to apply, which is what you argue, why didn't they put it in the statute? They have in other statutes. They have in other statutes, but what the TRW case tells us is that the place to go when Congress doesn't answer the question is to text and to structure of the statute. We think we have made... Yes, the TRW case was about the Fair Credit Reporting Act, and the language in that act makes clear that because there, and as the Supreme Court said, because there was an exception in the statute of willful misrepresentation of material information, then they would assume that they would interpret the act to say that the injury rule applied. But you don't have that kind of... It's a different statute, and you don't have... It's a different statute. And you don't have that situation. The legal question then on this issue before you, the first legal issue on this, is what is the court to do if the statute doesn't say anything other than accrual three years? That's all the language tells you. What I'm urging on you, what Professor Nimmer urges in his treatise, what some district court cases conclude... And some the other way. Exactly. And some the other way. But the only ones that deal with the legislative history, the only ones, out of all the cases in this area are cases that conclude that an injury rule applies, because the legislative history tells you again and again, and counsel for the plaintiffs were good enough to prepare a separate volume of legislative history, which we think is very, very valuable. The legislative history tells you that the Senate report concludes that a three-year statute should be enough to deal with all problems. I'll deal with equitable issues in a moment. But don't they always talk about the ordinary case, though, Nimmer and the legislative history? What's curious to me about this case is, sure, the ordinary case, there would be a convergence between the moment of copyright copying and the moment of discovery, because frequently we're dealing with works that will quickly be in the public domain, would we not? I'm no expert on copyright, but if we're dealing with music, we're dealing with movies, there are a whole variety of things that would quickly be in the public domain. But this appears to be the inverse of that. This seems to be the unusual case where you have some documents that are very important, but they're not in the public domain, they're carefully guarded, and your able adversary for some reason didn't learn about them until many years after they had been copied. So why, I guess it's a long-winded way of asking you, why should we, if we agree that the ordinary case, there is this convergence, why should we foist the ordinary case upon this rather unusual case? Because Congress addressed that. Because you will see in the legislative history that they said we can have what the copyright advisor, chief copyright advisor, said we can have a flat three-year rule, quote, flat three-year rule in this area. Because in general, just what you said is true. Because as a general matter, in copyright, unlike other areas, other issues, things will come out pretty soon. Copyright tends to be a public violation. And so they said because in general that will be so, we understand that in some cases it might not. A hypothetical was asked of a congressman. He was asked what happens if someone shows a movie in a small theater and shows it a few times and three years pass after the movie is shown. And the question was, are we saying that in that case, even though the owner of the movie doesn't even know anything about it, I mean, it's shown illicitly, does the three-year period run? And the answer is yes, the three-year period runs. Go ahead. No, you go. Let's assume the injury, that we agree with you on the injury rule here. What is the injury in this case? When did the injury occur in your view? I would say that the injuries here occurred from the moment the first copying occurred, which incidentally, we have argued to you and I just want to point it out, was 1991, which was the time that Mr. Hoy left the employer. It was not ten months later. There was cross-examination. I don't want to lose your points, Your Honor. No, no, no. You're saying that the mere retaining of the material without using it in any manner constituted the injury? No, because that's not a copyright violation. All right. So when did the injury occur? When he copied it. When he copied it. Yes. So under your theory, anyone who wanted to infringe, whether it's a movie, music, written materials, the thing to do is to get four or five people together, copy it, sit for three years and a day, and then distribute it worldwide. And then when the suits come like wildfire, you bring out your five witnesses and you say, time barred, game over. That's the nature of a statute of limitations, that a time comes. You take a chance when, as Congress, you adopt a statute of limitations with any fixed amount of years. Congress addressed the issue of what exceptions shall there be. They made very clear, for example, that fraud would be an exception. I'm sorry, Your Honor. No, that's okay. Let me pick up Judge Ziricca's question before. Assuming you're right and it's the injury rule and not the discovery rule, why shouldn't we at least hold that the district court was wrong in the second in knocking out the damages for the three-year period from the time of suit? Because he also did that. It also did that. In other words, you first had the first jury came back with the 13 years of damages, and then he said, no, you can't do that. You have to apply just the three years. So go back, Jury, the same or a different jury. I don't know. Go back and figure out what the damages were for the three years. Correct. But then he threw out the three years, too. No, he didn't, Your Honor. Why shouldn't we at least sustain that? He did, Your Honor. He did sustain the three years. No. No. Ultimately, he gave judgment for the defendant. No, Your Honor. I understand the fact. I'm sorry, Your Honor. There's a judgment entered in this case of $1,400,000 against one party, the U.S.I., and another quarter of a million dollars. Excuse me. Didn't he award summary judgment to the defendants? Yes, he awarded partial summary judgment limiting damages to three years. Then he sustained the damage award for the three years. So the issue here is not whether these plaintiffs will recover anything. They will recover, unless you rule for me on my third argument. But if you were simply to affirm the lower court, they would receive a judgment around $2 million, which is the $1.4 million that was awarded against U.S.I., plus the $250,000, $300,000 against Mr. Hoy, plus interest. I'm sorry. I may have misunderstood. So our view, I'd like to come back to this if I may. The injury rule is one which is, in our view, supported by the only legislative history there is, that if you look at the Senate report, it is couched in terms of a flat three-year rule, wanting a uniform rule prior to the adoption of the copyright law. The civil copyright damages were awarded under state law. And so you had statutes of limitations ranging from one to six years. Congress wanted to deal with that, and they dealt with it by adopting a three-year flat period. Let me ask. Well, I think we understand that, actually. Let me ask again. Under the injury rule, when did the infringement occur in this case? Tell me as specifically as you can. Under the injury rule, each copying was a separate violation of copyright. And that is, in general, true in copyright law. For example, in the three-year period that Judge Bartels ruled they could collect damages in, they collected for each and every copying that the jury found was causally connected to the copyright violation. Copying and use or just copying? I'm sorry, Your Honor? Copying and use of the copy or just copying? It's undisputed that all the copying here was copying for use. All right. All right. Good. Any other questions? Is there anything else you want to tell us? Yes, just the last thing, Your Honor. Returning in conclusion to the issue of storm warnings, two points. One, the copying began, for better or worse, the copying began from the time Mr. Hoy left the employ of Graham and moved to the other company. Mr. Wilson questioned him on this. He conceded against interest. There was nothing in it for him to say, yes, I took it home and I used it. And I did it from the start. Mr. Wilson said again and again to the jury that this all began in 1991, that it happened from the start. Mr. Hoy conceded that that was so. It was not until this subject of the statute of limitations rose that the plaintiffs started to try to make something of the fact that the first proposal as such that they had on which they were suing was July 1992. Second, and finally, Judge Bartle said, what is it, what is it that a rational, reasonable business, a businessman like Mr. Graham, a business like his business, would think that Mr. Hoy wanted these documents for? Why did he take them? These documents, which are about so big, are not for reading. They exist to be copied. I urge the court in the course of its consideration of this case to just have a look at any of the proposals at issue here. They are all in the record. They're all in the appendix. To take a final example, and I promise it's the last one, this is what happened in this case. The plaintiff basically said we're entitled to damages for every single bit of money that USI received at any time with respect to any client that there was any copying for. The jury didn't give that to him, though. The jury discounted the amount. Isn't that correct? Yes, Your Honor. It was argued that USI would have gotten from other proposals, not proposals with the copyrighted material. Yes. You're not arguing that the damages were wrong, are you? I'm not arguing that the damages awarded in the three-year period were wrong, no. I'm simply explaining to the court what the nature of the damage claim was in light of some of the questions asked of me. Good. I think we understand. Thank you very much, Your Honor. Mr. Abrams, thank you very much. Mr. Wolfson. Thank you, Chief Judge Sareka. We'll give you a couple of minutes. Thank you. A fair number of points made to rebut. First of all, I do have the record site, Judge Slobiter. It was PX60. I was wrong. I said PX21. Yes. It's in Volume 4. Oh, yes. We didn't bring them down. They were too big. We brought it down, and they were too big. Volume 4, Joint Appendix 2074 through 2086. Thank you. Relevant provisions are on pages 81 to 84, 2081 to 84. Now, why didn't the Graham Company just call him up and ask for the binders? First of all, the jury, it was undisputed, didn't know that he had the binders, okay? Secondly, in a sense, the Graham Company did better than just calling him up, because after he left, several months later, just the record site that I just cited to you, they have him sign this belt and suspenders agreement that protects the company in a number of ways and says, don't misuse our works. And after he signs that agreement, there's no information that the jury heard about suggesting that later, in July of 92, he would start infringing. They weren't on an adversarial basis, were they? I mean, they wouldn't have given. That's right. They were not. It's not clear to me. Was he fired or did he leave because it was too big and he wanted a smaller area? Right. So fired is a charged term. He was terminated. They had different views about how to conduct the business. He testified and the jury heard that he really did not like the Graham approach to the business, didn't want to deal with big clients, wanted to deal with the mom and pop clients. So they had an amicable. It was amicable. The jury heard that he departed, there was no bad blood, and he departed on amicable terms. In fact, he got a very lucrative deal from the Graham Company, whereby he got these six accounts that he had been working on. Graham Company was no longer interested in them. And was it reasonable for Graham to assume that having been accommodated with the six accounts, that the competition would cease there as opposed to the full-scale copying? Absolutely. Absolutely. So he's going to a different type of business. There was some dispute about whether this was a competitor. U.S.I., which is now a huge, well, was a huge publicly owned company, now is owned by Goldman Sachs, is a competitor. It's a huge publicly owned company anyway. That's a good point, Your Honor. So U.S.I. is a competitor of Graham. Back then where he went, Flanagan, O'Hara, and Gentry, we call it fog in the briefs, that was not a competitor. So he leaves on amicable terms. He's not a competitor. After he's left, he signs this agreement. And in any event, there's copyright notices over these materials, and Mr. Hoy had affirmed the copyright. Tell us why we should apply the discovery rule. Yes. Thank you, Your Honor. This case is a textbook example of, I should say poster child, although that term is misused too much, of why the copyright out cries out, cries out for a discovery rule. Because there are a class of cases, admittedly a minority of cases, that where the infringement is not known. And in those situations, think of software. Software or source code, that's going to be used internally at a business. It's not going to be on a projector. It's not going to be on the Internet. Software is protected, presumptively, by copyright. And so, if you create a rule that says that somebody can steal the source code, and then use it internally in the business, and obviously not tell anybody about that, and then ten years later you find out, you're limited. If they stopped using the software, you have no damages at all. At best, you might get damages for the three-year period. That is undermining the congressional intent behind 504B. 504B is the section, the only section under which we sought damages, that seeks the disgorgement of the full profits, the full benefit, that the defendant got from wrongfully using the copyrighted material. Now, to go back to legislative history, I agree with Mr. Abrams. I do recommend that you read from cover to cover the legislative history. It supports that view. The takeaway from the discussion, most of the discussion, in both the Senate and the House, was about whether or not to put a specific enumeration of exceptions into the Act. So they talked about, well, should we write in, except for fraudulent concealment, should we write in except for when you're in prison or infancy. Like they did in the Fair Credit Reporting Act. Exactly. And at the end of the day, this is in both the Senate report and the House report, they said a specific enumeration of certain circumstances or conditions might result in unfairness to some persons. So what does the legislative history tell you? It tells you that Congress was afraid of the application of the doctrine of expressio unius exclusio alterius, you know, which is discussed in TRW, right? They didn't want to list the specific things because they were afraid that the federal courts would then say, okay, those are the only exceptions. And the takeaway really is that Congress wanted the federal courts to develop the law under federal common law. Now to go back to structure and text, actually, ironically, the structure and text of the statute, which is what TRW says you should focus on, the structure and text of the statute does support the discovery rule. In Section 8, I'm sorry, Section 507A is the statute of limitations for criminal violations. Section 507B is what we're talking about here. That's for civil violations. Section 507A says no criminal proceedings shall be maintained unless brought within five years after the cause of action arose. And Section 507B, the civil one, says three years after the claim accrues. So right in the same paragraph, you have Congress using different words. The word arise means injury rule. You can see that in TRW itself. Justice Ginsburg cites the case of McMahon v. United States, which, by the way, is from 1951, six years before these 1957 amendments, right? And Justice Ginsburg says, you know, TRW has a strong argument based on the McMahon case that the word arise means injury rule. So we have Congress saying arise on the criminal side and then accrue on the civil side. Accrue can't mean arise under standard doctrine of statutory construction. It must mean the discovery rule. If we are under the injury rule, how does the injury occur in your view? The injury began in July of 1992. Mr. Abrams is being clever, and he certainly is clever. He keeps using the word use. There was some testimony in front of the jury that Mr. Hoy, it was vague. He said, I started using the books. I started using the books. Remember, use, I think Mr. Abrams said it, use is not a violation of the Copyright Act. The question is not whether he used them. If I go to a library and take a book out and read it, I'm not violating the Copyright Act. In fact, if I steal a book from the library, I'm still not violating the Copyright Act. And if I take a book out of the library and I use it as a model to base a similar book on it, that's also not a violation of the Copyright Act. I'm allowed, copyright protects expression, not ideas. I'm allowed to take the ideas out of a work. Mr. Hoy, under the Copyright Act, could have taken those books and said, these books are fantastic, but I see here a copyright notice. I don't want to get saddled with liability for copyright, but I'm going to take those books. I'm going to take the ideas. I'm going to take the structure. I'm going to take the high-level organizing principles, and I'm going to put a lot of time and effort into it, and I'm going to write my own books that will be kind of like that, but they won't be identical, and they won't be infringing. So he was allowed to do that, and the Graham Company could have assumed, and certainly the jury's decision was amply supported by the evidence, that the Graham Company could have reasonably assumed that Hoy wouldn't decide suddenly, 10 months after he left, to violate the Copyright Act in violation of his contract and also in violation of his knowledge of the fact that the Graham Company had put its copyright notice on these materials. Just one more point. You know, I think in the Urey case, the Urey case was a discovery rule case. It's cited in our brief. It's 1951. It's under the FELA, the Federal Employer's Liability Act, and that's an interesting case because the case itself, first of all, you have the Supreme Court adopting a discovery rule before these 1957 amendments, and there's certainly nothing. I think even Mr. Adams agrees to that. There's nothing in the legislative history saying, oh, we don't like that Urey case, okay? So that's background law that's out there. Discovery rule already applied, and it's also interesting how it's applied. Most causes of action under the FELA would be for patent injuries. Somebody gets hurt on the railroad, and the Urey case talks about that, but then what happened was there was a class of cases where people were getting silicosis, and so those were latent injuries. And so the Supreme Court in 1951 in the Urey case says, okay, we're going to really, the fair thing to do here is to have a discovery rule. Now, if you think about it, copyright is the quintessentially latent injury. It's true, of course, if you go to a movie, you see it. If you see it on the Internet, you know it's been infringed. But if somebody's out in the suburbs in a little company, or you just signed a deal and gave them your accounts, and he's off there in the room, and he's either typing or writing and copying out of your book word for word, page after page, 350 pages, and then typing, paying somebody to type it into their computer system, and that's all internal, that's not something you can feel. That's even more latent than silicosis. It's not in your body. It's an intellectual harm. Can you cite the Urey case in your brief? Yes, Your Honor. How do you spell it? U-R-I-E. Anything else you want to tell us? No, thank you, Your Honor. Good. The case was very well argued. We will take the matter under advisement. We would like to have a transcript made of the argument and ask that the parties share the cost of the transcript. Please check with the clerk's office before you leave. They'll tell you how to do that. Thank you, gentlemen. Thank you very much, Your Honors.